## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

MINNA RECHT. Derivatively and on Behalf )
of Nominal Defendant, DIEBOLD, INC., )
                              )
          Plaintiff. )
                              )
                              )
v. )
WALDEN W. O'DELL, ERIC C. EVANS. )
GREGORY T. GESWEIN. LOUIS V. )
BOCKIUS III. CHRISTOPHER M. )
CONNOR. RICHARD L. CRANDALL, )
GALE S. FITZGERALD. PHILLIP B. )
LASSITER. JOHN N. LAUER, WILLIAM )
F. MASSY. and HENRY D.G. WALLACE, )
                              )
          Defendants. )
                              )
                              )
and )
                              )
DIEBOLD, INC., )
                              )
          Nominal Defendant )

Civil Case No. **5:06CV 233**

Judge _____

# JUDGE DOWD
## MAG. JUDGE LIMBERT

JURY TRIAL DEMANDED

       Plaintiff Minna Recht ("Plaintiff"). derivatively and on behalf of Nominal Defendant

Diebold. Inc. by and through her undersigned attorneys, and for her Complaint against

Defendants herein. alleges the following based upon personal knowledge of the Plaintiff, and on

information and belief as to all other matters. based upon. *inter alia.* the investigation conducted

by and through Plaintiff's attorneys. which included. among other things. a review of the

Defendants' public documents, public announcements made by the Defendants. United States

Securities and Exchange Commission ("SEC") filings. wire and press releases published by and

regarding Diebold. Inc. (hereafter "Diebold" or the "Company") and information readily

obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.    This is a shareholder derivative action brought by Plaintiff and shareholders of Diebold against certain current or former officers and directors of Diebold seeking to remedy the Defendants' violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment and negligence that occurred from October 22, 2003 through the present, (the "Relevant Period") and that have caused substantial losses to the Company. [1]

2.    Diebold engages in the development, manufacture, sale, and service of self-service transaction systems, electronic and physical security systems, software, and various products used to equip bank facilities and electronic voting terminals principally in the United States.

3.    The complaint alleges that defendants' Relevant Period representations regarding Diebold were materially false and misleading when made for the following reasons: (1) that as a result of improper accounting for commission expenses, the Company's financial statements for 2004 and the first two quarters of 2005 were misstated; (2) that the Company lacked adequate internal controls; (3) that the Company was losing market share in North America to competitors; (4) that the Company's election machines were plagued with execution problems; and (5) that as a consequence of the above, the Company's statements with respect to its financial guidance lacked in all reasonable basis.

---

[1] Because Defendants have failed to take action to remedy the breaches of fiduciary duties that occurred between *October 22, 2003* and *September 21, 2005*, the Relevant Period continues through this day instead of ceasing on *September 21, 2005*, the day before the public became aware of the wrongdoings at the Company.

2

4.     On September 21, 2005, before the market opened, the Company announced it was lowering its third quarter and full-year earnings per share guidance for 2005. On this news, shares of Diebold fell $6.90 per share, or 15.55 percent, to close at $37.47 per share.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.

6.     This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

7.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' participation in the wrongful acts detailed herein, occurred in this district, and Diebold maintains its corporate headquarters in this District.  Further, Defendants either reside in or maintain executive offices in this district, and/or have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

8.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

9.     Plaintiff, Minna Recht, as set forth in the accompanying Verification, is, and was during the Relevant Period, a shareholder of Diebold.  Plaintiff is a resident of the State of New Jersey.

3

10.    Nominal Defendant Diebold is an Ohio corporation with its principal executive offices located at 5995 Mayfair Road, PO Box 3077, North Canton, Ohio 44720.

11.    Defendant Walden W. O'Dell, ("O'Dell") is a resident of the State of Ohio.  He was, at all relevant times, the Company's Chief Executive Officer and Chairman.

12.    Defendant Eric C. Evans, ("Evans") is a resident of the State of Ohio.  He was, at all relevant times, the Company's President and Chief Operating Officer.

13.    Defendant Gregory T. Geswein, ("Geswein") is a resident of the State of Ohio.  He was, at all relevant times, the Company's Senior Vice President and Chief Financial Officer.

14.    Defendant Louis V. Bockius III, ("Bockius") is a resident of the State of Ohio.  He has been a member of the Company's Board of Directors since 1978.

15.    Defendant Christopher M. Connor, ("Connor") is a resident of the State of Ohio.  He has been a member of the Company's Board of Directors since 2002.

16.    Defendant Richard L. Crandall, ("Crandall") is a resident of the State of Colorado.  He has been a member of the Company's Board of Directors since 1996.

17.    Defendant Gale S. Fitzgerald, ("Fitzgerald") is a resident of the State of New York.  She has been a member of the Company's Board of Directors since 1999.

18.    Defendant Phillip B. Lassiter, ("Lassiter") is a resident of the State of New York.  He has been a member of the Company's Board of Directors since 1995.

19.    Defendant John N. Lauer, ("Lauer") is a resident of the State of Ohio.  He has been a member of the Company's Board of Directors since 1992.

20.    Defendant William F. Massy, ("Massy") is a resident of the State of Wyoming.  He has been a member of the Company's Board of Directors since 1984.

4

21.    Henry D.G. Wallace. ("Wallace") is a resident of the State of Michigan.  He has been a member of the Company's Board of Directors since 2003.

22.    Defendants O'Dell. Evans. Geswein. Bockius. Connor. Crandall. Fitzgerald. Lassiter. Lauer, Massy. and Wallace are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants. because of their positions with the Company. possessed the power and authority to control the contents of Diebold's quarterly reports, press releases and presentations to securities analysts. money and portfolio managers and institutional investors. i.e.. the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public. each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

23.    By reason of their positions as Company officers and/or directors and because of their ability to control the Company's business and corporate affairs. the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith. trust. loyalty. and due care, and were and are required to use their utmost ability to control and manage the Company in a fair. just, honest. and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each Company director and officer owes to the Company and its shareholders the fiduciary duty to

5

exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

24.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

25.    To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

       a.  exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

       b.  exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

       c.  exercise good faith to ensure that the Company's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); and

       d.  when placed on notice of improper or imprudent conduct by the Company and/or its employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence.

26.    The Individual Defendants, particularly the Officers and member of the Board of Directors' Audit Committee, were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must

establish an internal accounting control structure. Among other things, the Individual Defendants were required to:

    a. make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

    b. devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

        • transactions are executed in accordance with management's general of specific authorization;

        • transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles.

27.      Moreover, according to Appendix D to Statement on Auditing Standards No. 55, ("SAS 55"), management should consider, among other things, such objectives as: (i) making certain that "[t]ransactions are recorded as necessary ... to permit preparation of financial statements in conformity with generally accepted accounting principles ... [and] to maintain accountability for assets;" and (ii) make certain that "[t]he recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

28.      According to SAS 55.13:

Establishing and maintaining an internal control structure is an important management responsibility. To provide reasonable assurance that an entity's objectives will be achieved, the internal control structure should be under ongoing supervision by management to determine that it is operating as intended and that it is modified as appropriate for changes in conditions.

29.      Diebold's Audit Committee Charter provides that the Audit Committee shall, among other things:

    a.    "obtain, review and discuss a report by the Company's independent auditors describing (1) the audit firm's internal quality control procedures, (2) any material issues raised by the most recent internal quality control review, or peer review, of the firm, or by any inquiry or investigation by

governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and (3) any steps taken to deal with any such issues."

b.      "review and discuss with the independent auditors the plans for, and the scope of, the annual audit and other examinations, including the adequacy of staffing and compensation."

c.      "review and discuss with the independent auditors the matters required to be discussed by Statement on Auditing Standards No. 61 relating to the conduct of the audit, as well as any audit problems or difficulties and management's response...."

d.      "review and discuss with appropriate officers of the Company and the independent auditors the annual audited and quarterly financial statements of the Company, including (1) the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and (2) the disclosures regarding internal controls and other matters required to be reported to the Committee by Section 302 of the Sarbanes-Oxley Act of 2002 and all rules promulgated thereunder by the SEC."

e.      "review and discuss earnings and other financial press releases (including any use of "pro forma" or "adjusted" non-GAAP information), as well as financial information and earnings guidance provided to analysts and rating agencies...."

f.      "review and discuss with the independent auditors, the senior executive responsible for the internal audit function and, if and to the extent deemed appropriate by the Committee Chair, members of their respective staffs or representatives of any person or entity to which the internal audit function has been outsourced the adequacy of the Company's internal accounting controls, the Company's financial, auditing and accounting organizations and personnel, and the Company's policies and compliance procedures with respect to business practices...."

## SUBSTANTIVE ALLEGATIONS

**Background**

30.     Diebold engages in the development, manufacture, sale, and service of self-service transaction systems, electronic and physical security systems, software, and various products used to equip bank facilities and electronic voting terminals principally in the United States. The Company's products primarily include self-service banking products and automated

8

teller machines. RemoteTeller System. vaults, safe deposit boxes and safes, drive-up banking equipment. and electronic voting systems. Its customers include banks and financial institutions, as well as colleges and universities. public libraries, government agencies, utilities. and various retail outlets. The Company sells its systems and equipment directly through its sales force to customers in the United States and through manufacturer's representatives and distributors worldwide.

**Materially False And Misleading Statements Issued During The Relevant Period**

31.     On October 22, 2003. Diebold issued a press release entitled "Diebold Announces Record Third Quarter Results." Therein, the Company, in relevant part, stated:

> Diebold. Incorporated (NYSE: DBD) today reported record third quarter 2003 net income of $48.289.000. an increase of 9.5 percent over third quarter 2002 net income of $44.080.000. Third quarter 2003 revenue was $570.239.000. a 7.6 percent increase over the third quarter 2002 revenue of $529.799.000. Diluted earnings per share in the third quarter 2003 were $.66. which was near the high end of the company's previous guidance of $.62 to $.67 per share.

> \*        \*        \*

> Financial Results

> "I am extremely pleased that we once again delivered solid results. I am particularly encouraged by the strong growth in financial self-service orders globally." said Walden W. O'Dell. Diebold chairman, president and chief executive officer. "Orders were very strong as global acceptance of the new Opteva ATM line is growing, as is demand for our security solutions where revenue grew more than 15 percent from the third quarter 2002.

> "Also, I am encouraged by our overall growth in Asia-Pacific. In the region, we completed the acquisition of two small security companies at the end of the quarter that will further strengthen our market presence there. We also had excellent performance from our business in the Americas during the quarter."

O'Dell continued. "Looking forward, these results, combined with growing demand globally for Opteva and our security solutions, positions us very well for future accelerated revenue growth."

Fixed Exchange Rate Third Quarter Orders

Despite a challenging global economic environment, total orders for product and service increased in the double-digit range. Financial self-service orders in the Americas, Asia-Pacific, and EMEA all increased in the double-digit range. Security orders remain strong, increasing in the high single-digit range. Total orders in North America grew in the double-digit range, excluding election systems.

Orders in election systems grew substantially from the third quarter 2002. The election systems business is driven by a small number of large orders in any given quarter, making quarter to quarter comparisons difficult. For example, election systems orders for the third quarter 2003 include a very large order from the state of Maryland.

*      *      *

Revenue

Total revenue for the quarter was $570.2 million, up $40.4 million, or 7.6 percent and 4.9 percent on a fixed exchange rate basis. Total financial self-service revenue increased 8.3 percent and 4.2 percent on a fixed exchange rate basis. Security solutions revenue grew 15.4 percent as a result of continued revenue growth in the financial industry, government and retail markets. Total financial self-service & security revenue increased by 10.1 percent and increased by 6.9 percent on a fixed exchange rate basis. Election systems revenue is comprised of a small number of very large contracts. The third quarter of 2003 included revenue from the state of Maryland contract, as compared to revenue from the state of Georgia contract in the third quarter of 2002.

32.    On January 28, 2004, Diebold issued a press release "Diebold announces record

fourth quarter and year-end results." Therein, the Company, in relevant part, stated:

Diebold, Incorporated (NYSE: DBD) today reported record fourth quarter 2003 revenue of $648,410,000, an increase of 23.3 percent over the fourth quarter 2002. Net income in the fourth quarter 2003 was $59,243,000, an increase of 170.0 percent over the fourth quarter 2002. Diluted earnings per share for the fourth quarter 2003 were $.81 per share versus $.30 per share in the fourth quarter of 2002, and was within the company's previous guidance of $.78 to $.83 per share.

The prior-year fourth quarter results included an after-tax charge of $26,494,000 related to the settlement of a dispute with the IRS regarding the deductibility of interest on debt related to corporate owned life insurance (COLI), which reduced fully diluted earnings per share by $.37. Net income and diluted earnings per share for the fourth quarter 2003 would have increased by 22.3 percent and 20.8 percent, respectively, versus the fourth quarter of 2002, if the impact of the COLI settlement charge was excluded from the 2002 results.

For the year ended December 31, 2003 Diebold reported revenue of $2,109,673,000, an increase of 8.7 percent over 2002. Net income in 2003 was $174,776,000, an increase of 76.3 percent from 2002. Fully diluted earnings per share were $2.40, an increase of 75.2 percent from $1.37 reported in 2002. Included in the 2002 results was a first quarter after-tax charge of $33,147,000 from a Cumulative Effect of a Change in Accounting related to the impairment of Goodwill (SFAS 142, Goodwill and Other Intangible Assets), which reduced 2002 fully diluted earnings per share by $.46. Net income and fully diluted earnings per share in 2003 would have increased by 10.0 percent and 9.1 percent, respectively, versus 2002, if the impact of the impairment charge and the previously discussed COLI settlement was excluded from the 2002 results.

\*     \*     \*

Financial Results "I am extremely pleased that we were able to deliver exemplary results for the quarter and year, exceeding $2 billion in revenue for the first time in our company's history. I am particularly pleased by the continued strong performance in the financial self-service business as market conditions in North America continue to improve, and we continue to gain market share globally," said Walden W. O'Dell, Diebold chairman and chief executive officer. "Global acceptance of the new Opteva ATM line continues to be strong as we saw a significant increase in Opteva as a percentage of overall ATM business.

"Our security business has also realized strong growth from the prior year with revenue up more than 13 percent for the quarter and nearly 18 percent for the year. We continue to make strides in the retail and government markets and gain share in the financial security market. In the election systems business, while purchasing decisions in 2003 were slower than anticipated, we are pleased with our strong market position and remain the clear leader in this space."

O'Dell continued. "Given current global business trends and the economic recovery underway in the United States, I am optimistic about our prospects in 2004."

33.     On April 20, 2004, Diebold issued a press release "Diebold Announces First Quarter Results." Therein, the Company, in relevant part, stated:

Diebold. Incorporated (NYSE: DBD) today reported first quarter 2004 net income of S29.169.000 on revenue of $498.255.000. with diluted earnings of $.40 per share. compared to $.36 in the first quarter of 2003. Diluted earnings per share were within the company's previous guidance of $.38 to $.42. Revenue grew 21.5 percent versus the first quarter of 2003. while net income increased 12.6 percent and diluted earnings per share grew 11.1 percent. This performance was driven by strong growth in the financial self-service business. which more than off set the dilutive effect of the election systems business. which was S.04 per share in the first quarter of 2004 compared to $.01 accretive in the first quarter of 2003.

*   *   *

Financial Results

"We're very pleased to have generated strong revenue growth in our financial self-service and security businesses. which performed exceptionally well during the first quarter" said Walden W. O'Dell. Diebold chairman and chief executive officer. "Market acceptance of Opteva is continuing to gain momentum globally. as the new product line continues to constitute a growing percentage of our overall financial self-service business. Our security solutions continue to gain momentum with double-digit revenue growth from the same period last year.

"Purchasing delays. as a result of ongoing political debate. are continuing to adversely impact the election systems business this year. As a result, we have significantly reduced election systems revenue and profit expectations for the current year. However. we remain confident in the long- term prospects of the election systems business. We've overcome these recent setbacks with our strong overall performance and have slightly increased full- year total revenue guidance for 2004."

O'Dell continued. "As a result of the overall performance of the business and the continued acceptance of our core product and service solutions in the marketplace. I am very optimistic about our prospects for the balance of this year - and beyond."

34.    On July 21. 2004. Diebold issued a press release "Diebold Announces Record Second Quarter Earnings Per Share of $0.60 on Strong Revenue Growth of 14.8 Percent." Therein, the Company. in relevant part. stated:

Diebold, Incorporated (NYSE: DBD) today reported record second quarter 2004 net income of $43.667.000 and diluted earnings per share of $.60. compared to diluted earnings per share of $.57 in the second quarter of 2003. Prior year EPS included a gain of approximately $.03 per share. which was a result of an early buyout of leased ATM equipment by a major customer. Diluted earnings per share grew 5.6 percent and were within the company's previous guidance of $.58

12

to \$.62 per share. Excluding the gain in the second quarter of 2003, diluted earnings per share would have increased by 11.9 percent.

Diebold also achieved record second quarter revenue of \$552,043,000, 14.8 percent higher than the second quarter of 2003. This significant increase in revenue was led by strong growth in financial self-service products which was fueled by strong demand for the company's new Opteva product solution, particularly in the United States.

\*       \*       \*

Financial Results

"I continue to be very encouraged by our strong order growth, as product orders in the second quarter were the highest in the company's history," said Walden W. O'Dell, Diebold chairman and chief executive officer. "Our Opteva solution continues to be well-received globally, particularly in North America, and we are encouraged by the margins on that product line. Our security solutions continue to be successful, and we're working to profitably grow that part of our business through strategic acquisitions and continued market penetration."

O'Dell continued, "Given the growth of Opteva and the success of our overall core product and service businesses, we continue to be very confident about the prospects for the company moving forward."

35.     On October 24, 2004, Diebold issued a press release entitled "Diebold Reports

Third Quarter Earnings Per Share." Therein, the Company, in relevant part, stated:

Diebold, Incorporated (NYSE: DBD) today reported third quarter 2004 net income of \$48,319,000 and diluted earnings per share of \$.67, compared to diluted earnings per share of \$.66 in the third quarter of 2003. Included in the third quarter 2004 earnings per share were previously disclosed product recertification, legal and other costs related to the pending civil action in the state of California, which adversely impacted quarterly earnings by approximately \$.05 per share. Diebold also achieved record third quarter revenue of \$613,393,000, 7.6 percent higher than the third quarter 2003 revenue of \$570,239,000.

Diluted earnings per share grew 1.5 percent, driven by strong performance in the financial self-service and security businesses. Earnings were adversely affected by the election systems business, which was dilutive by \$.04 per share in the third quarter of 2004 but was \$.06 accretive in the third quarter of 2003. Excluding the election systems business, the third quarter 2004 diluted earnings per share would have increased by 18.3 percent.

\*       \*       \*

13

Financial Results

"We are very encouraged by our continued strong order growth during the quarter," said Walden W. O'Dell, Diebold chairman and chief executive officer. "We also achieved strong earnings per share growth in our financial self- service and security businesses, growing more than 18 percent.

"As previously reported, election systems issues in California had a negative impact on earnings and margins during the third quarter," O'Dell continued. "However, we expect that the modernizing of voting systems in the United States will continue in 2005 and beyond, and we should have better visibility of the direction of the U.S. election systems market after the November election.

"While we are very pleased with the significant improvements in U.S. product and service margins excluding election systems, we still have opportunities for improvement internationally, particularly in western Europe where Opteva has not fully completed customer certifications. We continue to face rising commodity costs globally, and while Opteva has allowed us to overcome these challenges in the United States, we have not yet achieved significant Opteva volume levels in some key international regions. However, we are making significant progress in obtaining certifications globally and expect Opteva to increase market penetration in these key international regions in 2005."

Fixed Exchange Rate Third Quarter Orders

Total orders for product and service increased in the double-digit range excluding election systems. Financial self-service orders increased in the single-digit range, led by strong double-digit growth in Asia-Pacific and modest growth in the Americas, compared to a particularly strong 2003 third quarter. These financial self-service order gains were slightly offset by a low single-digit decline in EMEA, where the market remains competitive and Opteva is not fully certified by all customers. Security orders remain strong, increasing in the double-digit range. Orders in election systems declined due to the expected slowing of orders in 2004 in advance of the U.S. presidential election and a large order with the state of Maryland in 2003.

*       *       *

Revenue

Total revenue for the quarter was $613.4 million, up $43.2 million, or 7.6 percent and 6.4 percent on a fixed exchange rate basis*. Total financial self-service revenue increased 8.6 percent and 7.0 percent on a fixed exchange rate basis*. Security solutions revenue grew 17.0 percent and 16.9 percent on a fixed exchange rate basis*. Total financial self-service and security revenue increased by 10.8 percent and 9.5 percent on a fixed exchange rate basis.

36.     On January 10, 2005, *Barron's* published an article entitled "A Vote for Diebold:

It avoided any election snafus: now, it should enjoy a new upcycle for ATMs." The article, in

relevant part, read:

> In fact, Diebold's electronic voting machine business accounted for just 5% of its
> $2.31 billion in trailing 12-month revenues, versus 71% for ATMs and related
> services. But that didn't prevent investors from waiting for Nov. 2 to pass before
> casting their votes for Diebold. Its shares have soared 20% since Election Day,
> which came off with few hitches. But there could be plenty of more room to run,
> says Hibernia Southcoast Capital's Charles Brady, who rates the shares a Buy
> with a target of 66, up from about 54 last week, a buck or so from its 52-week
> high.
>
> As it turns out, Diebold's computerized polling technology performed admirably,
> and voting-machine revenue is expected to grow 10%-12%, perhaps reaching
> $100 million in 2005 and possibly surpassing $150 million by 2006, O'Dell says.
> "We are thrilled with the way our equipment performed during the past
> elections," he adds. "It has been more challenging than we would have imagined,
> [but] there is a lot of money to be made."
>
> But the real story driving Diebold's recent success centers on ATMs and security
> products and services. Fans of the stock view the North Canton, Ohio, company
> as a technology-hardware concern enjoying an honest-to-goodness replacement
> cycle. It began about a year ago, but could continue for another three years or so,
> says brokerage analyst Kartik Mehta of FTN Midwest Securities. ATMs and
> services together produce operating margins as high as 15%, which is the
> company's highest- margin business, he says. Revenues for Diebold's core
> "financial self-service" division are expected to have jumped about 13% to $1.7
> billion by the end of last year, Hibernia's Brady estimates.
>
> Other hardware purveyors are suffering from compressed margins, resulting from
> commoditization and a lack of demand-driven spending. That's why some tech-
> stock aficionados view Diebold as reasonably priced, trading at only 17.7 times
> 2005 earnings. NCR, which is Diebold's closest American competitor, but toils in
> different areas as well, trades at about 28.8 times 2005 earnings. Brady projects
> Diebold's 2004 annual earnings at $2.56 a share, 6.6% above 2003's. His $3.12
> estimate for 2005 is at the high end of the consensus range found by Thomson
> Financial: the median >05 estimate was $3.08.
>
> Driving the ATM replacement cycle is a combination of factors: Age, new
> technology, new regulatory requirements and bank branch growth. It has been
> nearly 10 years since Diebold introduced dramatic technological innovations to its
> ATM line, and the machines [sic] lifetimes average about seven years. Thus,
> when Diebold launched its new Opteva machines in March of 2003, banks were
> ready to buy. "We had orders instantly," O'Dell recalls.

In addition to existing machines were getting long in the tooth. the new ATMs with advanced software and operating systems help lower total costs for financial institutions that own them. What's more. credit-card companies. new banking policies and governmental requirements also are driving change. Visa and MasterCard are requiring ATMs meet their more stringent computer security encryption standards by yearend '05.

Plus, the banking industry is moving toward the elimination of paper. allowing ATMs to take pictures of deposited checks without physically having them retrieved and cleared. Proposed changes to the Americans with Disabilities Act would require ATMs to incorporate voice-guidance features. The new ATMs boast Windows-based operating systems: IBM will no longer support its archaic OS/2 operating system used in some existing ATMs. Brady says.

And that's just in North America. where Diebold commands 67% of the $1.1 billion market. NCR is second with a 28% share. and German-based Wincor Nixdorf is third with about 3%. In Europe. the Middle East and Africa. a $1.8 billion market. NCR is No. 1 with a 47% share. Wincor Nixdorf is second with 30%. and Diebold is third with 18%.

NCR is believed to have grabbed its edge in Europe because it already had an established sales and service network in place due to its legacy cash register business. But Diebold CEO O'Dell says that his company is making gains in Europe. where he sees his company capturing more growth. Wincor. for example. tends to control the German market. but the introduction of Opteva gives Diebold a chance to win over European Union customers. "It has been exceedingly well-received all over the world. We should gain share in Europe in 2005 and 2006." O'Dell says.

Yet with all of this attention paid to newfangled ATMs and electronic voting machines. one should not overlook Diebold's legacy security business. which accounts for about a quarter of its total revenues. Diebold made a name for itself. when its metal safes survived the Great Chicago Fire of 1871. Since then. the company has been synonymous with banking security. FTN Midwest's Mehta predicts that Diebold's $600 million in yearly revenues from security could grow as much as 12% in 2005.

37.     On January 26. 2005. the Company issued a press release entitled "Diebold

Reports Fourth Quarter Financial Results." Therein the Company. in relevant part. stated:

Diebold. Incorporated today reported record fourth quarter 2004 net revenue of $717.2 million. up 10.6 percent from the fourth quarter of 2003. Diluted earnings per share were $.87. an increase of 7.4 percent and within the previous guidance of $.87 to $.92. Net cash provided by operating activities was $160.7 million. up 127.9 percent from the prior year, while free cash flow improved $142.3 million or 139.6 percent. For the full year 2004. the company reported net revenue of

$2,380.9 million, up 12.9 percent from 2003, diluted earnings per share of $2.54, an increase of 5.8 percent from 2003. Full- year net cash provided by operating activities was $232.6 million, up 14.3 percent from the prior year, while free cash flow was $171.4 million, up 31.2 percent from 2003.

Diluted earnings per share in the fourth quarter grew 7.4 percent driven by strong performance in the financial self service and security businesses. Earnings were adversely affected by the election systems business which was dilutive by $.03 per share in the fourth quarter of 2004, including charges of approximately $.02 per share associated with previously disclosed election systems product recertification, legal and other costs related to concluding the civil action in the state of California. Election systems business was $.03 per share accretive in the fourth quarter of 2003.

Fourth Quarter Highlights

        - Total product orders, excluding election systems, grew in the double-digit range.

        - Security solutions revenue grew 23.8 percent, and 23.3 percent on a fixed exchange-rate basis.

        - Asia Pacific total revenue increased 29.8 percent, and 28.2 on a fixed exchange-rate basis, while total revenue in the Americas, excluding election systems, grew 15.4 percent, and 14.5 percent on a fixed exchange-rate basis.

        - Diluted earnings per share would have increased by 15.4 percent, excluding the election systems business.

        - Free cash flow improved $82.9 million; while accounts receivable days sales outstanding improved 20 days, moving from 83 days at September 30, 2004 to 63 days at December 31, 2004.

Full Year Highlights

        - Total product orders grew well into the double-digit range.

        - Total financial self-service revenue grew 13.1 percent and 10.1 percent on a fixed exchange-rate basis.

        - Security solutions revenue grew 16.8 percent and 16.5 percent on a fixed exchange-rate basis.

        - Diluted earnings per share increased by 5.8 percent, and grew 12.8 percent excluding the impact of the election systems business.

        - Free cash flow improved $40.7 million, or 31.2 percent, moving from $130.7 million in 2003 to $171.4 million in 2004.

- The company repurchased 1,534,181 shares of Diebold stock.

Diebold managed to maintain operating margin in the financial self-service business by controlling operating expenses and improving manufacturing efficiencies to offset price erosion in the market, especially in Western Europe. Security solution margins declined slightly primarily because of increased fuel and steel costs. Election systems generated operating losses in 2004 as a result of lower revenue as well as product recertification, legal and other costs related to concluding the civil action in the state of California.

38.    On April 20, 2005, the Company issued a press release entitled "Diebold Reports

First Quarter Financial Results." Therein the Company, in relevant part, stated:

Diebold, Incorporated today reported record first quarter 2005 revenue of $540.2 million, up 8.4 percent from the first quarter of 2004. The company reported first quarter net income of $26.7 million, compared to net income of $29.2 million in the first quarter 2004. Diluted earnings per share were $.37, a decline of 7.5 percent and within the previous guidance of $.35 to $.40. Net cash provided by operating activities was $78.4 million, up 389 percent from the prior year, while free cash flow improved by $59.6 million, moving from a free cash use of $1.2 million in the first quarter 2004 to free cash flow of $58.4 million.

Included in the first quarter 2005 reported results were restructuring charges of $7.3 million, or approximately $.07 per share, related primarily to the realignment of the company's operations in Western Europe, consistent with previous guidance. The first quarter 2005 effective tax rate was 32.8 percent, compared with previous guidance of 31.5 percent. The higher first quarter effective tax rate reduced reported earnings per share by approximately $.01. Excluding the impact of both the restructuring charges and the higher effective tax rate, diluted earnings per share in the first quarter would have been $.45, or 12.5 percent higher than the first quarter of 2004.

First Quarter Highlights

- Total product orders, excluding election systems, grew in the double-digit range led by double-digit growth in the Europe, Middle East and Africa (EMEA) region and the Americas.

- Total Opteva orders were approximately $109 million, an increase of more than 80 percent from the first quarter 2004 as this new platform continues to gain wider market acceptance globally.

- Security solutions revenue grew 19.9 percent and 19.6 percent on a fixed exchange-rate basis.

- Asia Pacific total revenue increased 14.2 percent. and 12.5 on a fixed exchange-rate basis, while total revenue in the Americas. excluding election systems, grew 13.8 percent. and 12.4 percent on a fixed exchange-rate basis. - Net cash provided by operating activities improved by $62.4 million, or 389 percent; while accounts receivable days sales outstanding improved 13 days. moving from 96 days at March 31. 2004 to 83 days at March 31. 2005.

Financial Results

"We are encouraged by our continued strong order growth in financial selfservice. particularly in EMEA. which experienced a double-digit increase as we continue to make progress with Opteva customer certifications," said Walden W. O'Dell. Diebold chairman and chief executive officer. "We achieved strong earnings per share growth. excluding restructuring charges. and the higher-than-expected effective tax rate. growing 12.5 percent from a strong first quarter in 2004. We were also pleased that we were able to slightly improve operating profit margins compared to the prior year period. excluding the effect of restructuring charges. In addition, we were very pleased with the strong cash flow performance in the first quarter of 2005, and as a result are raising our full-year free cash flow guidance to $210 to $250 million, representing a $10 to $20 million improvement over previous guidance.

"Financial self-service revenue growth was somewhat less than expected due to disappointing revenue performance in EMEA as we focused on completing much of the restructuring of our operations there. However, with the strong first quarter orders achieved. a solid backlog in place and a fully functioning restructured manufacturing facility. we expect to achieve double-digit second quarter revenue growth in EMEA and meet our previously stated guidance for total financial self-service revenue growth for the year. Our security business continues to perform very well led by strong organic growth as well as the successful integration and strong performance by our recent acquisitions."

O'Dell continued. "As we look to the remainder of 2005. we are encouraged by order growth for Opteva. which remains strong globally. We are, however. faced with rising fuel costs. which are expected to impact full- year earnings by $.02 per share. As a result of the impact of fuel prices. a $.02 impact from a higher-than-anticipated tax rate and a $.01 impact of higher restructuring charges. our current expectations for full- year earnings per share are $2.80 to $2.93. including $.09 to $.12 of restructuring charges. This represents a 15 to 19 percent increase in earnings per share over 2004, excluding the impact of restructuring charges."

39.    The statements contained in ¶¶ 31-38 were materially false and misleading when made because defendants failed to disclose or indicate the following: (1) that as a result of improper accounting for commission expenses, the Company's financial statements for 2004 and

the first two quarters of 2005 were misstated: (2) that the Company lacked adequate internal controls; (3) that the Company was losing market share in North America to competitors; (4) that the Company's election machines were plagued with execution problems; and (5) that as a consequence of the above, the Company's statements with respect to its financial guidance lacked in all reasonable basis.

**The Truth Begins To Emerge**

40.     On June 30, 2005, the Company issued a press release entitled "Diebold Reduces 2005 Second Quarter and Year-End Earnings Outlook." Therein, the Company, in relevant part, stated:

> Diebold, Incorporated today announced it has lowered its second quarter and full year earnings per share guidance for 2005, as its North America growth outlook has been revised downward and is now in line with current expectations of customer demand.
>
> Additionally, the company has identified a reconciliation issue in its North America sales commission accrual account, as of December 31, 2004, with the impact on specific prior years yet to be determined. As a result of this reconciliation, the company has determined the commission account was under accrued by approximately $13 million at the end of 2004. This is a preliminary estimate and the final amount could vary. A thorough review is currently underway and is expected to be completed shortly. This amount is excluded from earnings estimates provided throughout the remainder of this outlook.
>
> Revised Second Quarter and Full-Year Expectations
>
> The company now expects second quarter earnings to be $.47 to $.50. Included in this earnings estimate are restructuring charges of $.04 per share and European Opteva manufacturing start- up costs and related issues of approximately $.03 per share. Excluding these one-time items, second quarter earnings per share are expected to be $.54 to $.57.
>
> Full-year 2005 operating earnings are now expected to be $2.60 to $2.70. This range excludes manufacturing start-up costs and related issues of approximately $.04 per share, and restructuring charges of $.15 to $.30. The company has defined and is reviewing various options for restructuring and will provide a more definitive review of its anticipated restructuring costs in its second quarter earnings announcement. This revised earnings guidance compares to 2004 full-year earnings per share of $2.54.

Factors contributing to the lowered earnings expectations are:

- Growth in the company's North America business is lower than its previous expectations as upgrade/replacement activity in the regional bank segment has developed at a slower than expected rate.

- A proportionately higher mix of revenue from the company's international operations and election systems businesses, which carry lower margins.

- A negative foreign currency exchange impact due to the strengthening of the dollar, particularly against the Euro which moved from approximately $1.30 to $1.20 during the second quarter.

- Continuing cost challenges in the transition to a single, global product platform

Cost-Reduction Initiatives

To further strengthen its competitiveness, the company is initiating several actions now and for the remainder of 2005:

- The elimination of approximately 300 full-time positions in North America and Western Europe. This action includes jobs affected by the recently announced closing of the Danville, Va., manufacturing facility.

- Further global manufacturing realignment and facility consolidation.

- Acceleration of the consolidation of research and development operations and service functions.

- Further product cost reductions through procurement, manufacturing and design improvements.

"We are disappointed with our financial performance during the quarter and with our revised outlook for the year," said Walden W. O'Dell, Diebold chairman and chief executive officer. "Our global markets remain healthy as we once again experienced strong growth in orders and backlog during the quarter. However, our North America revenue outlook is lower than previously expected, resulting in a lower profit outlook. In addition, we continue to face challenges on the cost side as we transition to a global product platform. We are moving quickly and decisively to improve our performance by accelerating our cost-reduction initiatives."

O'Dell added, "There is tremendous value in Diebold, from the strength of our brand to our world-class technology and product solutions. We are confident that by taking these aggressive cost actions now, we will be able to leverage our leadership position in the marketplace and ensure long-term, profitable growth."

41.    On this news, shares of Diebold fell $5.44 per share, or 10.76 percent, on June 30, 2005, to close at $45.11 per share.

42.    On July 27, 2005, the Company issued a press release entitled "Diebold Reports Second Quarter Financial Results." Therein, the Company, in relevant part, stated:

> Diebold, Incorporated today reported second quarter 2005 revenue from continuing operations of $629.2 million, up 15.3 percent from the second quarter of 2004. The company reported second quarter net income of $33.3 million, compared to net income of $43.6 million in the second quarter of 2004. Diluted earnings per share were $.47, a decline of 21.7 percent from $.60 per share in the second quarter of 2004 and within the most recent guidance of $.47 to $.50 per share.
>
> Included in the second quarter 2005 reported results are restructuring charges of approximately $.03 per share and European Opteva manufacturing startup costs and related issues of $.04 per share. Excluding the impact of the restructuring charges and the European startup costs and related issues, diluted earnings per share in the second quarter would have been $.54 per share, consistent with previous guidance.
>
> As previously announced o n July 5, 2005, the company sold its campus card systems division. As a result, the financial results from this business have been classified as a discontinued operation.
>
> Second Quarter Highlights
>
> - Total product orders, excluding election systems and the Brazilian lottery business, grew in the high single-digit range led by double- digit growth in the Europe, Middle East and Africa (EMEA) region.
>
> - The company secured a large order for lottery machines in Brazil for approximately $52 million.
>
> - Total Opteva orders were approximately $131 million, an increase of more than 58 percent from the second quarter 2004.
>
> - Security solutions revenue grew 25.0 percent and 24.1 percent on a fixed exchange-rate basis.
>
> - Asia Pacific total revenue increased 49.9 percent, and 45.4 percent on a fixed exchange-rate basis.
>
> - EMEA financial self-service revenue increased 14.2 percent, and 10.8 percent on a fixed exchange-rate basis.

- Receivable days sales outstanding improved 18 days, moving from 92 days at June 30, 2004 to 74 days at June 30, 2005.

\* \* \*

Financial Results

"We are clearly disappointed with our profitability during the quarter," said Walden W. O'Dell, Diebold chairman and chief executive officer. "As we previously indicated, most of the markets in which we compete remain healthy and we once again experienced strong growth in orders and backlog during the quarter. However, slower than anticipated upgrade and replacement activity in the North America regional bank segment, cost challenges in our transition to a single global product platform, a higher mix of lower-margin revenue and negative foreign currency exchange impact due to the strengthening of the dollar in the quarter are negatively impacting our profit margins."

O'Dell added, "We are focused on improving the profitability of our business. In addition to previously disclosed cost-reduction actions, we are initiating some strategic changes within our organization. These changes are aimed at increasing the effectiveness of the functions across Diebold to better support our global efforts. The most sweeping of these changes is the establishment of a single Global Marketing organization, formed through consolidating several channel-based marketing functions. These changes will streamline our operations and drive improved efficiency and knowledge management throughout the company. Also, we have restructured our Global Software & Services organization by integrating all its functions into other existing organizations to better leverage resources and combine similar knowledge bases within the company.

"As a result of these and other actions, we anticipate cost reductions of approximately $20 million on an annual basis. I am confident that these structural changes to our organization, as well as our other cost-saving initiatives, will significantly improve our profitability and competitiveness in the marketplace."

43.     On August 8, 2005, Diebold issued a press release entitled "Diebold CFO

Resigns; Krakora Named Interim CFO." Therein, the Company, in relevant part, stated:

Diebold, Incorporated (NYSE: DBD) today announced that Gregory T. Geswein, senior vice president and chief financial officer has resigned, effective August 12, 2005. After serving as CFO for more than five years, Geswein is leaving the company to become CFO of The Reynolds and Reynolds Company (NYSE:REY), based near Dayton, Ohio. Kevin J. Krakora, vice president and corporate controller, has been named interim CFO until a successor is identified. Diebold will be conducting an internal and external search for a successor.

"Greg's leadership has been instrumental to the company's success over the past five years. This is a voluntary decision on Greg's part, and we wish him well in his future endeavors. He will be missed." said Walden W. O'Dell, chairman and chief executive officer. "During his tenure, Greg built a very capable financial team, which will ensure a smooth transition as we search for a successor."

Prior to joining Diebold as CFO in April 2000, Geswein spent a year with Agilysys (formerly Pioneer-Standard Electronics) in Cleveland, Ohio as CFO and 13 years with Mead Corporation in Dayton, Ohio. Originally from Ironton, Ohio, Geswein earned a bachelor's degree in Business Administration and an MBA, from the University of Cincinnati.

"While I am very proud to have been a part of Diebold's transformation over the past five years, I am looking forward to returning to my roots in Southwest Ohio." said Geswein. "This affords me a unique opportunity to be closer to my family in that area."

44.     On September 21, 2005, the Company issued a press release entitled "Diebold

Reduces 2005 Third Quarter and Year-End Earning Outlook - North America revenue outlook

below previous expectations." Therein, the Company, in relevant part, stated:

Diebold, Incorporated today announced it is lowering its third quarter and full-year earnings per share guidance for 2005.

The company now anticipates third quarter EPS in the range of $.32 to $.37, which includes restructuring charges of approximately $.07 per share related to the continued realignment of its operations, manufacturing start-up and other one-time costs of approximately $.04 per share, and the one-time gain of approximately $.18 per share on the sale of the campus card systems business. Excluding these items, EPS is expected to be in the range of $.25 to $.30.

Full-year EPS is now expected to be $1.90 to $2.00. This range excludes restructuring charges of approximately $.30 per share, manufacturing start-up costs and other one-time costs of approximately $.08 per share, and the one-time gain of approximately $.18 per share on the sale of the campus card systems business. This revised earnings guidance compares to 2004 full-year earnings per share of $2.53.

Factors contributing to the lowered earnings expectations are:

        - Overall North America financial self-service revenue outlook is lower than previously expected, resulting in lower profit expectations.

- Certain revenue anticipated from the company's North America business for the third quarter is being pushed out to future periods, partially impacted by the effect of Hurricane Katrina.

- Operational inefficiencies, rising fuel costs and pricing pressures are continuing to negatively impact gross margins.

- Higher effective tax rate of approximately 34 percent for the year.

"I am extremely disappointed with our lack of progress in correcting our operational inefficiencies, and I am personally committed to taking immediate action to improve our effectiveness in these areas," said Walden W. O'Dell, Diebold chairman and chief executive officer. "We are evaluating further restructuring and other actions to improve our performance and competitiveness beyond the current restructuring guidance. We will have more to report on all these efforts during the coming months."

Total financial self-service revenue is expected to be more than $50 million lower during the current quarter compared to previous expectations, with most of the shortfall occurring in North America as the company experienced continued market weakness in the more profitable regional bank segment. This segment represents the majority of Diebold's North America automated teller machine-related sales, with half of the company's global financial self-service revenue derived from North America. The lowered revenue expectations are also a result of customer delays and operational inefficiencies that were compounded by Hurricane Katrina, which affected scheduled ATM deliveries, security installations, service maintenance contracts and other near-term business throughout the Gulf region.

Additionally, the impact of Hurricane Katrina is negatively affecting scheduled election systems deliveries in the Gulf region, resulting in approximately $10 million in lower elections systems revenue during the quarter. While management is still quantifying the overall impact of Hurricane Katrina, the company anticipates overcoming some of the shortfall caused by the hurricane in future periods as the affected regions begin to rebuild. Also, fuel prices have increased dramatically, resulting in significantly higher costs in freight and service fleet operations. The company is taking steps to overcome this continuing issue, including instituting a fuel surcharge on certain services. "We continue to be adversely affected by significantly unfavorable geographic revenue mix as the North America market for ATMs has weakened, particularly among regional banks," added O'Dell. "In addition, we are experiencing global supply chain and manufacturing inefficiencies and rising commodity costs, which were exacerbated by Hurricane Katrina. In response, we are instituting price increases in appropriate areas. Despite the recent weakness in the North America ATM market, we remain confident that the markets we serve remain healthy, and the actions we are taking will better position us for 2006 and beyond."

45.    On this news, shares of Diebold fell $6.90 per share, or 15.55 percent, to close at $37.47 per share.

46.    On December 6, 2005, the website rawstory.com published an article detailing an interview with a Diebold whistleblower entitled "Recent Revelations About Problems With Diebold's Voting Systems." The article stated, in part, as follows:

> In an exclusive interview with RAW STORY, a whistleblower from electronic voting heavyweight Diebold Election Systems Inc. raised grave concerns about the company's electronic voting technology and of electronic voting in general, bemoaning an electoral system the insider feels has been compromised by corporate privatization.

> \*     \*     \*

> But the company insider became disillusioned **after witnessing repeated efforts by Diebold to evade meeting legal requirements or implementing appropriate security measures,** putting corporate interests ahead of the interests of voters.

> \*     \*     \*

> **"There's a lot of pressure in the corporation to make the numbers: `We don't tell you how to do it, but do it.' [O'Dell is] probably the number one culprit putting pressure on people,"** the source said.

> \*     \*     \*

> Previous revelations from the whistleblower have included evidence that **Diebold's upper management and top government officials knew of backdoor software in Diebold's central tabulator before the 2004 election, but ignored urgent warnings—such as a Homeland Security alert posted on the Internet.**

> \*     \*     \*

> The difficulties of installing paper trails

> Responding to public demand for paper trails, Diebold has devised a means of retrofitting its paperless TSX system with printers and paper rolls. But in Ohio's November 2005 election, some machines produced blank paper.

> The whistleblower is not surprised. "The software is again the culprit here. It's not completely developed. I saw the exact same thing in Chicago during a demonstration held in Cook County for a committee of people who were looking at various election machines... They rejected it for other reasons."

Asked if Ohio officials were made aware of that failure prior to the recent election. the source said, "No way. **Anything goes wrong inside Diebold, it's hush-hush."**

Most officials are not notified of failed demonstrations like the one in Cook County, the insider said, adding that most system tests, particularly those exhibited for sale are not conducted with a typical model.

(Emphasis added.)

47.    Soon afterward, on December 15, 2005, the *Miami Herald* printed an article

entitled "New tests fuel doubts about vote machines", which stated, in part:

A political operative with hacking skills could alter the results of any election on Diebold-made voting machines -- and possibly other new voting systems in Florida -- according to the state capital's election supervisor, who said Diebold software has failed repeated tests.

Ion Sancho, Leon County's election chief, said tests by two computer experts, completed this week, **showed that an insider could surreptitiously change vote results and the number of ballots cast on Diebold's optical-scan machines.**

After receiving county commission approval Tuesday. **Sancho scrapped Diebold's system for one made by Elections Systems and Software,** the same provider used by Miami-Dade and Broward counties. The difference between the systems: Sancho's machines use a fill-in-the-blank paper ballot that allows for after-the-fact manual recounts. while Broward and Miami-Dade use ATM-like touchscreens that leave no paper trail.

                        *        *        *

Sancho first clashed with Diebold in May, when he teamed up with a nonprofit election-monitoring group called BlackBoxVoting.org, which has made a crusade of showing that electronic voting machines are subject to fraud. BlackBox hired Herbert Thompson, a computer-science professor and strategist at Security Innovation, which tests software for companies such as Google and Microsoft.

Thompson couldn't hack into the system from the outside. So Sancho gave him access to the central machine that tabulates votes and to the last school election at Leon County High.

**Thompson told The Herald he was "shocked" at how easy it was to get in, make the loser the winner and leave without a trace.** The machine asked for a

27

user name and password. but didn't require it, he said. That meant it had not just a "front door, but a back door as big as a garage," Thompson said.

From there, Thompson said, he typed five lines of computer code -- and switched 5,000 votes from one candidate to another.

"I am positive an eighth grader could do this," Thompson said.

(Emphasis added.)

48.    Most recently, the California Secretary of State requested more testing for Diebold voting machines before they could be certified for use in California elections. On December 20, 2005, the Associated Press released an article entitled "Secretary of State asks for more testing of Diebold machines." This article stated, in part, as follows:

Secretary of State Bruce McPherson on Tuesday told electronic voting machine manufacturer Diebold Election Systems that it must submit two of its machines for more rigorous federal testing before they can be certified in California.

**The memory cards on the systems have "unresolved significant security concerns," according to a letter sent to Diebold Tuesday from McPherson's elections chief, Caren Daniels-Meade.**

She asked the company to submit source coding, or program instructions, for the machines to federal investigators.

The problems were discovered during routine testing of the machines by state employees and independent consultants, said Secretary of State spokeswoman Jennifer Kerns. **She said each system approved for use in California must meet 10 security requirements, and the Diebold machines did not meet one of those standards.**

"This is a unique case in which we discovered that the source code had never, ever been reviewed," said Kerns. **"There were potential security risks with it."**

(Emphasis added.)

## DEMAND WOULD BE FUTILE

49.    Plaintiff brings this action derivatively in the right and for the benefit of Diebold to redress injuries suffered and to be suffered by Diebold as a result of the breaches of fiduciary

28

duty by the Individual Defendants. This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

50.     Plaintiff will adequately and fairly represent the interests of Diebold and its shareholders in enforcing and prosecuting its rights.

51.     Plaintiff is an owner of Diebold common stock and was an owner of Diebold common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

52.     Derivative Plaintiff has not made a demand on the board of directors to bring these causes of action because such a demand would be futile. At the time these derivative actions were commenced, the board of directors consisted of twelve members: Louis V. Bockius III, Richard L. Crandall, William F. Massy, Eric J. Roorda, Henry D.G. Wallace, Alan J. Weber (members of the Audit Committee), Thomas W. Swidarski (the Company's CEO and President), Christopher M. Connor, Phillip R. Cox, Gale S. Fitzgerald, Phillip B. Lassiter, and John N. Lauer (members of the Compensation Committee). As detailed below, each of the directors are subject to substantial liability on these derivative claims and are therefore in no position to render a disinterested judgment on whether the Company should bring them, and/or lack sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

53.     All of these directors face a substantial likelihood of liability in this action because of their failure, as directors, to assure that a reliable system of financial controls was in place and functioning effectively. The dramatic breakdowns and gaps in those controls were so widespread and systematic that the entire board faces substantial exposure to liability, under the *Caremark* doctrine, for their total abrogation of their duty of oversight. These directors either

29

knew or should have known that violations of law were occurring and took no steps in a good faith effort to prevent or remedy that situation, proximately causing hundreds of millions of dollars of losses for the Company.

**Additional Likelihood of Substantial Liability of the Audit Committee Defendants.**

54. Derivative Defendants Bockius, Crandall, Massy, and Wallace also had enhanced responsibilities as members of the Company's Audit Committee. That Committee was charged by § 301 of the Sarbanes-Oxley Act with direct responsibility for the appointment, compensation, and oversight of the work of the outside auditors; and the Audit Committee Charter imposed a detailed set of responsibilities and powers in connection with financial reporting and financial controls. Defendants Massy and Wallace have been determined to be a "financial expert" as required by § 307 of the Sarbanes-Oxley Act. As people of special knowledge and talents, more is expected of Massy and Wallace in preventing and ferreting out fraud and inadequate financial controls than of other directors.

55. Given the size, scope, and blatancy of the accounting violations and misrepresentations described above, the Audit Committee members either knew of the financial manipulations or turned a blind eye to them. Such conduct is also not protected by the business judgment rule and exposes these five Individual Defendants to a substantial threat of liability in this action.

56. In addition, should Defendants Bockius, Crandall, Massy, Roorda, and Wallace decide to bring claims against themselves, that would likely trigger an "insured vs. insured" exclusion which is typical for D&O insurance policies, which would make D&O insurance coverage unavailable to them.

**Additional Likelihood of Substantial Liability of Other Board Members**

30

57. Derivative Defendant Directors Connor, Fitzgerald, Lassiter, and Lauer are also exposed to substantial potential liability in this action because of their complete failure to put appropriate financial and legal compliance controls in place to assure the accuracy of financial information disclosed by the company to the public.

58. In addition, Defendant Directors Connor, Fitzgerald, Lassiter, and Lauer are further exposed to liability because of their membership on the Compensation Committee. In those positions, they approved compensation plans for senior executives and directors, pursuant to which millions of dollars were paid out by the Company based on financial results that have now turned out be grossly inflated. They have nonetheless failed to take any steps to recover any of these illegal and improper bonus and incentive compensation payments, even though, in the case of the Defendants O'Dell, Evans and Geswein, as CEO, COO and CFOs of the company, they were required to recover such payments pursuant to § 304 of the Sarbanes Oxley Act.

59. In addition, should Defendants Connor, Fitzgerald, Lassiter, and Lauer decide to bring claims against themselves, that would likely trigger an "insured vs. insured" exclusion which is typical for D&O insurance policies, which would make D&O insurance coverage unavailable to them.

**Directors Swidarski, Cox, Weber and Roorda Lack Independence**

60. Director Thomas W. Swidarski, as the Company's current President and CEO, lacks the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

61. Director Eric J. Roorda is a member of the Board's Compensation Committee, and so, as described above, lacks the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

62.     Directors Phillip R. Cox and Alan J. Weber are members of the Board's Audit Committee, and so, as described above, lack the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

63.     In addition, demand would be a futile and useless for the additional following reasons:

a.  Director Defendants, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein;

b.  The Director Defendants of Diebold, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Diebold's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties. Each of the Director Defendants exhibited a sustained and systemic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness;

c.  In order to bring this suit, a majority of the Directors of Diebold would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

d.  The acts complained of constitute violations of the fiduciary duties owed by Diebold's officers and directors and these acts are incapable of ratification; and

e.  Diebold has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual and Director Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Diebold any part of the damages Diebold suffered and will suffer thereby;

64.     Plaintiff has not made any demand on the shareholders of Diebold to institute this action since demand would be a futile and useless act for the following reasons:

a.  Diebold is a publicly held company with approximately 69.33 million shares outstanding, and thousands of shareholders;

32

     b. Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses or phone numbers of all the shareholders; and

     c. Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

65.    Diebold has expended and will continue to expend significant sums of money as a result of the illegal and improper actions described above. Such expenditures will include, but are not limited to:

     a. Costs incurred to carry out internal investigations, including legal fees paid to outside counsel and experts.

**FIRST CAUSE OF ACTION**

**Against Individual Defendants**
**for Breach of Fiduciary Duty**

66.    Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

67.    The Individual Defendants owed and owe Diebold fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Diebold the highest obligation of good faith, fair dealing, loyalty and due care.

68.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

69.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial condition and business prospects of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

70.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Diebold has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

71.     Plaintiff, on behalf of Diebold, has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Against The Individual Defendants
### for Abuse of Control

72.     Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

73.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Diebold, for which they are legally responsible.

74.     As a direct and proximate result of the Individual Defendants' abuse of control, Diebold has sustained significant damages.

75.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

76.     Plaintiff, on behalf of Diebold, has no adequate remedy at law.

## THIRD CAUSE OF ACTION

### Against The Individual Defendants
### for Gross Mismanagement

77.     Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

78.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties

with regard to prudently managing the assets and business of Diebold in a manner consistent with the operations of a publicly held corporation.

79. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Diebold has sustained significant damages in excess of millions of dollars.

80. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

81. Plaintiff, on behalf of Diebold, has no adequate remedy at law.

### FOURTH CAUSE OF ACTION

#### Against The Individual Defendants
#### for Waste of Corporate Assets

82. Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

83. As a result of the Individual Defendants' improper conduct and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, Individual Defendants have caused Diebold to waste valuable corporate assets by paying bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

84. As a result of the waste of corporate assets, Individual Defendants are liable to the Company.

85. Plaintiff, on behalf of Diebold, has no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### Against The Director Defendants
### for Unjust Enrichment

86.     Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

87.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Diebold.

88.     Plaintiff, as shareholder and representative of Diebold, seeks restitution from the Individual Defendants, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Against the Individual and Director Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual and Director Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.     Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of the Individual Director Defendants' trading activities or their other assets so as to ensure that Plaintiff has an effective remedy;

36

C.    Awarding to Diebold restitution from the Individual and Director Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by these Defendants;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:      January 30, 2006                Respectfully Submitted,

Mark Kitrick (0000021)
Mark Lewis (0063700)
John A. Harris, IV(0072341)
KITRICK AND LEWIS CO., L.P.A.
515 East Main Street, Suite 515
Columbus, Ohio 43215
Telephone: (614) 224-7711
Facsimile: (614) 225-8985

William B. Federman, TBA (00794935)
W. Todd Ver Weire, TBA (24040291)
FEDERMAN & SHERWOOD
120 N. Robinson, Suite 2720
Oklahoma City, OK  73102
Phone:  (405) 235-1560
Fax:  (405) 239-2112
wfederman@aol.com
tvw@federmanlaw.com
        - and –
2926 Maple Avenue, Suite 200
Dallas, TX  75201

37